STEPHENS, Judge.
 

 This case was commenced by the filing of a summons and complaint on 25 September 2002. It arises out of Plaintiffs' allegations that the methods of electing members of the Board of Directors of the Lumbee River Electric Membership Corporation ("LREMC"), a private North Carolina nonprofit rural electric cooperative distributing retail electricity in sections of four North Carolina counties, are racially discriminatory. In particular, Plaintiffs alleged that the Board of Directors and officers of LREMC refused to reform a voting system which produced a lack of diversity on the Board by (1) requiring that all LREMC members who vote in elections for Board members vote for each of the four seats up for election in order to cast a valid ballot (the "Rule of Four"), (2) permitting candidates to campaign together on a "slate" which enabled the incumbent Board members, all Native American, to entrench themselves in power, and (3) requiring voters to attend an annual meeting in order to vote in Board elections, and scheduling the meeting at a time and in a place that made it difficult for many of the working members of LREMC to attend. By answer filed 24 October 2002, Defendants denied all of Plaintiffs' allegations of discriminatory voting procedures.
 

 On 6 February 2004, Plaintiffs filed an amendment and supplement to their complaint alleging numerous irregularities surrounding the 7 October 2003 election of LREMC Board members. Specifically, Plaintiffs challenged the deadline set by LREMC for candidates to file for the election, the manner in which notice of that deadline was given, the content of the application required by LREMC for candidates filing for the election, the advertisements published by LREMC regarding the election, and the notice to members about the annual meeting for the election. Plaintiffs further alleged multiple irregularities in the voting procedures at the annual meeting, including the numbering of ballot boxes, the failure of LREMC personnel to maintain security of the ballot boxes, an inadequate amount of general and handicapped parking spaces, the site of the meeting and election "in the center
 of the Native-American population," inaccurate counting of ballot slips, and unauthorized and fraudulent resolution voting. On 3 March 2004, Defendants responded to the amendment and supplement and denied all allegations of irregularities in the 7 October 2003 election process and results.
 

 In furtherance of their position, Plaintiffs filed a motion for a temporary restraining order and injunction seeking to overturn the 2003 election and requesting that a new election be ordered. By order filed 15 March 2004, the Honorable G.K. Butterfield, Jr. denied Plaintiffs' motion to set aside the election, but enjoined Defendants from "scheduling or conducting any further elections ... until a trial on the merits."
 

 The case was then tried non-jury before the Honorable Robert F. Floyd, Jr. from 28 to 30 July 2004. At the conclusion of Plaintiffs' evidence, Defendants moved for dismissal of all claims based on (1) the business judgment rule, (2) the absence of evidence to support Plaintiffs' position, and (3) conflict with federal law. On 27 September 2004, Judge Floyd entered an Order in which he made detailed findings of fact and concluded that Plaintiffs' claims were not supported by facts or applicable law. He thus granted Defendants' motion for a directed verdict and ordered that all of Plaintiffs' claims were "dismissed in their entirety." From Judge Butterfield's and Judge Floyd's orders, Plaintiffs appeal.
 

 Plaintiffs bring forth five arguments on appeal. Each asserts that Plaintiffs presented sufficient evidence "to survive a motion for directed verdict." These arguments require this Court to review the evidence presented below under the applicable standard of review. At the outset, we note that Defendants inaccurately characterized their motion to dismiss as a motion for a directed verdict, and the trial judge erroneously stated in his order dismissing Plaintiffs' claims that he was granting the motion for a directed verdict. It is well settled that in actions tried before the judge without a jury, a motion to dismiss is made under N.C. Gen.Stat. § 1A-1, Rule 41(b), not Rule 50(a).
 
 Crump v. Coffey,
 

 59 N.C.App. 553
 
 ,
 
 297 S.E.2d 131
 
 (1982). The distinction is significant since, under Rule 41(b), the trial judge does not consider the evidence in the light most favorable to the plaintiff, as he would when considering a Rule 50(a) motion for a directed verdict in a trial before a jury.
 
 Dealers Specialties, Inc. v. Neighborhood Hous. Services, Inc.,
 

 305 N.C. 633
 
 ,
 
 291 S.E.2d 137
 
 (1982). Instead, under Rule 41(b), the trial judge "must consider and weigh all the competent evidence before him, passing upon the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn therefrom."
 
 Inland Bridge Co. v. North Carolina State Highway Comm'n,
 

 30 N.C.App. 535
 
 , 544,
 
 227 S.E.2d 648
 
 , 653-54 (1976) (citations omitted). Under Rule 41(b), the judge, as the trier of the facts, may "find the facts against plaintiff and sustain defendant's motion ... even though plaintiff has made out a prima facie case which would have precluded a directed verdict for defendant in a jury trial."
 
 United Leasing Corp. v. Miller,
 

 60 N.C.App. 40
 
 , 45,
 
 298 S.E.2d 409
 
 , 413 (1982) (citation omitted),
 
 disc. review denied,
 

 308 N.C. 194
 
 ,
 
 302 S.E.2d 248
 
 (1983). When the trial court grants a motion to dismiss under this rule, the judge must make detailed findings of fact and separate conclusions of law in accordance with N.C. Gen.Stat. § 1A-1, Rule 52(a). The trial court's findings of fact are conclusive on appeal if they are supported by competent evidence, even if there is evidence to the contrary.
 
 Lumbee River Elec. Membership Corp. v. City of Fayetteville,
 

 309 N.C. 726
 
 ,
 
 309 S.E.2d 209
 
 (1983).
 

 We thus review Judge Floyd's dismissal of Plaintiffs' claims to determine whether his findings of fact are supported by any competent evidence.
 
 [1]
 

 The Lumbee River Electric Membership Corporation is organized and operates under N.C. Gen.Stat. § 117-6,
 
 et seq.,
 
 the "Electric Membership Corporation Act" originally enacted
 in 1935 to implement the act of Congress creating the Rural Electrification Administration. The statutory purpose of the LREMC is to promote and encourage "the fullest possible use of electric energy in the rural section of the State by making electric energy available ... at the lowest cost[.]" N.C. Gen.Stat. § 117-10 (2005). Electric membership corporations may serve only persons who "shall use energy supplied by such corporation and [who] shall have complied with the terms and conditions [of] membership contained in the bylaws of such corporation[.]" N.C. Gen.Stat. § 117-16 (2005). LREMC serves members residing in parts of Cumberland, Hoke, Robeson, and Scotland counties. Its members include Caucasians, African-Americans, and Native Americans as well as a relatively small percentage of Hispanics. LREMC has estimated the racial composition of its Robeson County members as 48 percent Native American, 29 percent Caucasian and 20 percent African-American. No evidence was presented to establish the racial composition of the membership in LREMC's three other county service areas, nor was there any evidence that any racial group constitutes a majority of the corporation's total membership.
 

 By statute, each rural electric membership corporation is required to have a board of directors, elected as set out in N.C. Gen.Stat. § 117-13. In pertinent part, this provision provides that the members of the corporation's board of directors "shall be elected annually by the members entitled to vote ... [and] must be members of the corporation[.]" N.C. Gen.Stat. § 117-13 (2005). Election of directors on a staggered-term basis is permitted if the corporation's bylaws so provide.
 

 Id.
 

 All directors must be elected for terms of equal duration, and no term may be longer than three years.
 

 Id.
 

 The statute grants the board of directors broad powers "to do all things necessary or convenient in conducting the business of a corporation, including ... [t]o make its own rules and regulations as to its procedure." N.C. Gen.Stat. § 117-14 (2005). In addition, the board is given power to adopt and amend bylaws for the management and regulation of the affairs of the corporation[.] The bylaws ... may make provisions not inconsistent with law ... regulating ... the number, times and manner of choosing, qualifications, terms of office, official designations, powers, duties, and compensations of its officers ... [and] the date of the annual meeting and the giving of notice thereof[.]
 

 Id.
 

 In 1999, the General Assembly enacted a number of amendments to various provisions of Chapter 117, none of which is at issue here. The 1999 Session Laws regarding those amendments, however, in section 8, provide as follows:
 

 It is the intent of the General Assembly that both the election of board members and the hiring of employees of electric membership corporations
 
 should reflect
 
 the diversity of the communities those corporations serve. To those ends, the General Assembly directs that each electric membership corporation of North Carolina
 
 shall report
 
 minority representation on its board and in its workforce to the North Carolina Association of Electric Cooperatives so that the Association can report on minority representation to the Joint Legislative Commission on Governmental Operations.
 

 1999 N.C. Sess. Laws ch. 180, § 8 (emphasis added).
 
 [2]
 

 In support of their allegations that the LREMC violated (1) a legislative mandate contained in the foregoing session laws, (2) its own bylaws, and (3) Title VI of the Civil Rights Act of 1964 against racial discrimination in the election of members of the Board of Directors, Plaintiffs offered evidence tending to establish the following:
 

 Before 1966, LREMC's Board of Directors was made up exclusively of white members. In 1967, the first Native American Director was elected to the Board. From 1967 through 1971, the Cooperative had a bi-racial Board of Directors. The Board was tri-racial
 from 1972 through 1982 and bi-racial from 1983 through 1993. From 1994 to 20 April 2004, the Board was composed entirely of Native Americans. As of 20 April 2004, following bylaw changes which included the creation of two additional director positions and the appointment by the Board of one white and one African-American to fill those positions, the LREMC Board became tri-racial again.
 

 Before 20 April 2004, the Board consisted of twelve Directors, with nine of them residing in particular geographic districts and elected by the total membership to represent the district in which each lived, and three of them elected at-large. All served staggered three-year terms. From at least 1958, a "Rule of Four" required members to vote for one candidate in each contested Director race. Voting in fewer than all of the contested races was not acceptable. Thus, if members turned in ballots that did not comply with the "Rule of Four," the ballots were considered "spoiled" and were not counted.
 

 Defendant Robert Locklear, called by Plaintiffs, testified that he had been a director of the Board for approximately six years and had been elected twice. He was familiar with the changes made in the bylaws in 2004 and said they abolished the procedure which required the voter to vote for four different candidates on one ballot (
 
 i.e.,
 
 the "Rule of Four"). The changes allowed a voter to vote for one to four candidates according to the voter's choice, but he did not think the changes would prohibit candidates from running together on a slate. Robert Locklear had run on a slate of four candidates in each of his elections. He testified that being on a slate with other candidates who would get out and see the LREMC members would help get the entire slate elected. "[T]o get a seat on this board, on the LREMC board, you got to get out and work. If you don't get out and work, you don't get a seat on it." He did not believe that running candidates on a slate made it difficult for people who were not already on the Board to get elected. "If you got out and worked, I think most anyone could get a seat on that board."
 

 Robert Locklear was also familiar with the bylaw change in 2004 that increased the number of Board directors. He testified that the additional seats were added to diversify the Board. He said LREMC staff and their attorneys recommended that the Board place a Caucasian and an African-American in the two new seats. Robert Locklear knew that the two new Board directors were from Raeford, North Carolina, and one was white while the other was black. He recalled that the new white Board member, Mr. Upchurch, was in business and had "high qualifications," although he could not recall Mr. Upchurch's specific qualifications. He also knew that the new black member was a businessman. Before this change, during Robert Locklear's tenure, all Board directors were Native American.
 

 In addition to the elimination of the "Rule of Four" and the addition of two new Board members, the Board reapportioned its district boundaries to try to achieve an equal number of consumers in each district. Robert Locklear did not know the racial breakdown of the members in his district. He did not know the breakdown at the time he was originally elected or when the bylaw changes were made in 2004.
 

 Defendant Ambrose Locklear was also called as a witness by Plaintiffs. He testified that he had been a director of the Board for almost ten years and had been elected three times. In his last two elections, he had run on a "slate" with three other candidates. In the earlier election, he ran with three other incumbent Board members. In his last election, he ran with two incumbents and a nonincumbent. Ambrose Locklear described the "slate" as consisting of a piece of paper, or campaign literature, on which the four candidates' names were listed. The candidates on the slate do not necessarily receive the same number of votes. In his opinion, he had been re-elected because of "getting out and working with all races of people[,] [p]oliticking, asking people to ask consumers to vote for me[.]"
 

 Ambrose Locklear testified further that the "Rule of Four" voting procedure had been changed at the recommendation of LREMC's Credentials and Election Committee
 because of the high number of "spoiled ballots," or ballots where voters voted for fewer than four candidates. He clarified that the Board changed in 2004 from nine districts to five districts upon the recommendation of LREMC staff to equalize the population of the districts. He stated that the two new director seats were added because of consumer growth in the Cumberland County portion of the service area, and to "[d]iversify the board [racially]." Ambrose Locklear knew that one new Board member, Mr. Hollingsworth, was black, and the other new member, Mr. Upchurch, was white. Before the Board appointed Mr. Hollingsworth and Mr. Upchurch, the LREMC staff provided Board members with background information regarding their education and occupation, as well as their qualifications to serve on the Board. Based on the staff recommendations and the qualifications of Mr. Hollingsworth and Mr. Upchurch, Ambrose Locklear voted to appoint them to the new Board seats because he felt "that they would make good board members." Before the appointment of Mr. Hollingsworth and Mr. Upchurch, Ambrose Locklear had never voted for or supported a Caucasian or African-American candidate, but he had advised whites and blacks to run.
 

 Ambrose Locklear did not know the racial breakdown of the LREMC members in the district which he served as a Board member.
 

 Plaintiffs next called Defendant Herbert Clark as a witness. Mr. Clark testified that he had been a director on the LREMC Board for sixteen years. Mr. Clark explained that when Board members ran on a slate, they supported each other and asked for the consumers to support all candidates on the slate. He stated that the Board grew from twelve members to fourteen members "because of the uneven areas up in the northern part of our district [that] was (sic) heavily populated with members." Mr. Clark voted to appoint Mr. Upchurch and Mr. Hollingsworth as the new Board members, but he did not know their educational background or whether they had experience with electric membership corporations. Mr. Clark believed that the bylaw changes made by the Board were in the best interests of the LREMC consumers, although he was unable to articulate the reasons for his opinion. Mr. Clark was not questioned about the racial breakdown of the LREMC members in his district.
 

 Defendant Broughton Oxendine, called by Plaintiffs, testified that he has been a Board member for three years and served on the annual meeting committee. Mr. Oxendine said that running on a slate was helpful to a campaign because he would have more people working for him. He stated that he did not support electing candidates by district because it would make the process too political. He did support the 2004 bylaw changes, testifying that he voted to extend the hours for members to vote at the annual meeting and to eliminate the "Rule of Four" as recommended by the Credentials and Election Committee. He also supported the redistricting changes because of rapid growth in parts of the LREMC service area which had resulted in disparity in the number of customers represented by Board members. With respect to the appointment of the two new Board members, Mr. Oxendine testified that the Board needed Mr. Upchurch and Mr. Hollingsworth for diversity. He considered Mr. Upchurch to be a "pretty sharp businessman" and was aware that Mr. Hollingsworth managed a radio station. Mr. Oxendine was not questioned about the racial composition of the district he represents.
 

 Angus Thompson, II, employed as the Robeson County Public Defender, testified regarding his familiarity with voting rights litigation and expressed his opinion that the use of slates and multi-member districts can adversely affect a minority group's ability to participate in the electoral process. He testified further that, in his opinion, the reduction in the number of LREMC districts from nine to five could operate to "submerge" minority groups and thereby create safer districts for Native Americans. Mr. Thompson acknowledged that he was unaware of the racial breakdown of the LREMC membership and conceded that his testimony about submerging minority groups was based on his familiarity with the racial composition of the population as a whole and not on the composition of LREMC consumers. As for
 the LREMC membership, Mr. Thompson had no information or knowledge regarding the percentage of black, white, Hispanic and Native American members. Although he expressed an opinion that the voting methods employed by LREMC would present obstacles to the election of black members to the Board of Directors, he was not aware of any black member who had filed a petition to run for the Board. Mr. Thompson also testified that in a number of North Carolina counties, including Robeson County, "there is some racial block voting, there is racially polarized voting[.]"
 

 Frank Boyette, a Caucasian, testified that he had been a member of the Credentials and Election Committee for approximately twenty years and had chaired the Committee for fifteen years, including during the 2003 election. He thus presided at a hearing conducted by the Committee to consider a protest of the 2003 election brought by Ronald Hammonds, who is also a plaintiff in this lawsuit. After the hearing, the Committee recommended that all ten challenges to the election procedures and results be denied, and that Mr. Hammonds' request to set aside the election likewise be denied. The Committee also recommended that the LREMC Board consider elimination of the "Rule of Four" because "[w]e ordinarily have between 60 and 80 spoiled ballots every year, and it appears that most of those spoiled ballots are the result of not understanding exactly how the process works." Additionally, even though 2003 was the first year in Mr. Boyette's experience that a complaint was made regarding the amount of voting time, the Committee recommended that the Board consider extending the time in subsequent elections.
 

 Ronnie Hunt, CEO of LREMC, testified that the corporation's annual meeting had been held at Pembroke State University (now The University of North Carolina at Pembroke) since 1978. Before 1978, the meeting was held at the armory in Red Springs with the exception of 1977 when it was held at the Charlie Rose Agricultural Center in Cumberland County. Six Greyhound buses transported Native Americans from other parts of LREMC's service areas to participate in the 1977 meeting and election. Half of the incumbent Board members lost their bids for re-election that year.
 

 The only Plaintiff called to testify was Ronald Hammonds, a Native American. Mr. Hammonds had previously served on the LREMC Board of Directors from 1982 to 1994. Before the 1994 election, Mr. Hammonds had spoken out about the lack of diversity on the Board. He believed that this caused other directors to exclude him from running on a slate with them. In 1994, Mr. Hammonds lost his bid for re-election. Mr. Hammonds has run for election to the Board on at least three occasions since 1994, testifying that "I've ran for that board, I've ran every way possible, with a slate, without a slate, any way that's possible, I have ran for it." He has not been successful in his efforts. In his opinion, the "Rule of Four" and slate campaigns contributed to his defeat every time.
 

 Mr. Hammonds testified further that he believed the "Rule of Four" procedure was not eliminated earlier because of a mistaken belief by Board members that they were prohibited from making such a change under the terms of a prior lawsuit. He agreed that the Board members did give consideration to the question of which bylaw rules are best for Board elections, stating, "I'm sure in their own mind, in their own conscience, they ... gave it the very best."
 

 Mr. Hammonds protested several elections and was concerned about the security of ballot boxes. He further testified that, in his opinion, slate voting, coupled with intimidation, changing filing deadlines, refusing to allow candidates to track ballot boxes, and refusing candidates the right to inspect ballot boxes contributed to election obstacles. "[A]ll we are asking for is just a reasonable opportunity to be elected." In the 2003 election, he lost to the incumbent Board member, Ambrose Locklear, by 121 votes.
 

 With this evidentiary backdrop and in light of the standard of appellate review for Rule 41(b) dismissals, we examine the arguments brought forward by Plaintiffs. First, however, we address Defendants' argument that Plaintiffs' appeal should be dismissed for violations of the Rules of Appellate Procedure.
 

 Defendants contend that this Court should dismiss this appeal due to Plaintiffs' failure to comply with Rules 10 and 28 of the North Carolina Rules of Appellate Procedure. Specifically, Defendants raise two procedural flaws in Plaintiffs' brief: (1) failure to provide record or transcript references in their assignments of error, in violation of the requirements of Rule 10, and (2) failure to provide record or transcript citations in the Argument section of their brief, in violation of Rule 28. Although Defendants advance sound legal arguments to support their position and Plaintiffs' brief does not conform completely to the mandates of the Rules, thereby subjecting their appeal to dismissal, for the reasons stated below we nevertheless elect to reach the merits of this appeal.
 

 Rule 10(c)(1) provides in relevant part that "[a]n assignment of error is sufficient if it directs the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references." N.C. R.App. P. 10(c)(1). Rule 28(b)(6) provides in relevant part that "[e]vidence or other proceedings material to the question presented may be narrated or quoted in the body of the argument, with appropriate reference to the record on appeal or the transcript of proceedings, or the exhibits." N.C. R.App. P. 28(b)(6). "The North Carolina Rules of Appellate Procedure are mandatory and failure to follow these rules will subject an appeal to dismissal."
 
 Viar v. N.C. DOT,
 

 359 N.C. 400
 
 , 401,
 
 610 S.E.2d 360
 
 , 360,
 
 reh'g denied,
 

 359 N.C. 643
 
 ,
 
 617 S.E.2d 662
 
 (2005) (internal quotations omitted).
 

 In
 
 Viar,
 
 our Supreme Court admonished this Court for invoking Rule 2 and suspending the rules. Rule 2 allows either appellate court, upon application of a party or upon its own initiative, to suspend or vary the requirements of any of the rules "[t]o prevent manifest injustice to a party, or to expedite decision in the public interest[.]" N.C. R.App. P. 2. In nevertheless dismissing the appeal in
 
 Viar,
 
 the Supreme Court stated that "[i]t is not the role of the appellate courts, however, to create an appeal for an appellant."
 
 Viar,
 
 359 N.C. at 402,
 
 610 S.E.2d at 361
 
 . The
 
 Viar
 
 Court continued to warn that without the consistent application of the rules, they would "become meaningless, and an appellee is left without notice of the basis upon which an appellate court might rule."
 

 Id.
 

 The Court dismissed the appeal for the appellant's failure to number the assignments of error, failure to make specific record references within each assignment of error, and failure to "state plainly, concisely and without argumentation the legal basis upon which error [was] assigned."
 

 Id.
 

 at 401
 
 ,
 
 610 S.E.2d at 361
 
 .
 

 Since
 
 Viar,
 
 this Court has dismissed appeals based on procedural flaws and, by distinguishing
 
 Viar,
 
 continued to rule on the merits of cases despite procedural errors. For example, in
 
 N.C. Dep't of Crime Control & Pub. Safety v. Greene,
 

 172 N.C.App. 530
 
 ,
 
 616 S.E.2d 594
 
 (2005), this Court did not address assignments of error that were deemed too broadsided. The Court was especially troubled by assignments of error that were not followed by record or transcript citations, nor an indication regarding which findings the appellant challenged.
 

 Id.
 

 In
 
 Broderick v. Broderick,
 
 ___ N.C.App. ___, ___,
 
 623 S.E.2d 806
 
 , 807 (2006), this Court dismissed an appeal where appellant's "assignment of error places no limit on the legal issues that could be addressed on appeal and the appellee fails to receive adequate notice of the basis upon which the appeal might be resolved."
 
 See also Consol. Elec. Distributors. v. Dorsey,
 

 170 N.C.App. 684
 
 ,
 
 613 S.E.2d 518
 
 (2005) (appeal dismissed for failure to separate each question presented in the argument section of the appellant's brief, failure to reference each assignment of error with numbers and pages to the record on appeal, failure to support arguments with legal authority, failure to provide a full and complete statement of the facts, and failure to number each assignment of error separately in the record on appeal).
 

 Conversely, in
 
 Welch Contr'g, Inc. v. N.C. DOT,
 
 ___ N.C.App. ___, ___,
 
 622 S.E.2d 691
 
 , 694 (2005), despite appellant's violation of Rules 10 and 28 (the assignment of error in the record on appeal did not correspond to the question presented in the brief), this Court reached the merits of the case because
 appellee "had sufficient notice of the basis upon which our Court might rule." Additionally, in
 
 Davis v. Columbus County Schs.,
 
 ___ N.C.App. ___, ___,
 
 622 S.E.2d 671
 
 , 674 (2005), this Court determined that, despite appellant's failure to direct the Court's attention to which findings of fact or conclusions of law were being contested in the assignments of error, dismissal was unwarranted because appellant included "assignments of error with record references in their brief." Finally, in
 
 Youse v. Duke Energy Corp.,
 

 171 N.C.App. 187
 
 , 192,
 
 614 S.E.2d 396
 
 , 400 (2005), despite eight alleged rule violations, this Court ruled on the merits because the Court was still "able to determine the issues in this case on appeal." The Court also determined that "in filing a brief that thoroughly responds to [appellant's] arguments on appeal," appellee was clearly on notice of the pertinent issues upon which the Court could rule.
 

 Id.
 

 In the case at bar, Defendants contend that Plaintiffs' assignments of error fail to provide clear record or transcript citations. In the record on appeal, Plaintiffs raise twenty errors assigned to the trial court. However, Plaintiffs do not provide any record or transcript references. This is a violation of Rule 10 and grounds for dismissal under
 
 Viar
 
 ;
 
 Greene
 
 and
 
 Dorsey.
 

 Plaintiffs do provide broad record and transcript citations for each assignment of error in the Argument section of their brief. Under
 
 Davis,
 
 this may be adequate to allow the Court to reach the merits. However, each argument cites to the same record and transcript references. Specifically, Plaintiffs direct the Court to certain pages of the record on appeal where the trial court's order granting a directed verdict (dismissal) appears. The order contains fourteen findings of fact and ten conclusions of law. Plaintiffs make no effort to narrow the Court's attention to particular findings or conclusions to which error is assigned.
 

 Similarly, the portion of the transcript cited by Plaintiffs is of the trial judge explaining the rationale for his ruling and directing the Defendants to draw a proposed order. Once again, Plaintiffs fail to direct the attention of the Court to a particular statement, finding or conclusion to which error is assigned. Since Plaintiffs' brief fails to comply with the requirements of Rule 10, the appeal is subject to dismissal.
 

 Additionally, the Argument section of Plaintiffs' brief continues for eighteen pages, and although Plaintiffs allege evidence or narrate facts from the trial, the Argument section contains only three transcript or record references. Plaintiffs do provide ample citations in their "Statement of Facts." However, not providing record or transcript citations in their Argument section is a violation of Rule 28(b)(6). Accordingly, Plaintiffs' appeal is also subject to dismissal for violation of this Rule.
 

 Since the decision of the Supreme Court in
 
 Viar,
 
 this Court has not treated violations of the Rules as grounds for automatic dismissal. Instead, the Court has weighed (1) the impact of the violations on the appellee, (2) the importance of upholding the integrity of the Rules, and (3) the public policy reasons for reaching the merits in a particular case. We will conduct the same analysis here.
 

 Even though the Rule violations in this case are troublesome, we do not believe that Defendants were substantially prejudiced. Plaintiffs' assignments of error are specific enough to put Defendants on notice of the contested issues and upon what basis this Court might rule. Moreover, like appellee in
 
 Youse,
 
 Defendants' brief establishes that they received sufficient notice of the issues being brought to this Court for determination.
 

 Further, while the integrity of the Rules is important and must be upheld, lest the Rules become meaningless, we believe that maintaining the integrity of our laws through proper interpretation and application outweighs the importance of dismissal in a case in which Rule violations had little to no impact.
 

 Finally, at the heart of this case are issues of potential racial discrimination. This Court would not serve the citizens of this State well if it elected to pass on issues with far-reaching implications. We believe that it is more important to "expedite decision in the public interest" than it is to dismiss a case due to a
 technical violation of the rules. Accordingly, we reach the merits.
 

 By his Order filed 27 September 2004 on Defendants' motion to dismiss, Judge Floyd made the following pertinent findings of fact:
 

 3. The members of LREMC elect their Cooperative's Directors in a political process established by the Cooperative's bylaws. See N.C. Gen.Stat. §§ 117-13; 117-15.
 

 . . . .
 

 6. The predominant racial groups within the Cooperative's membership base are Native American, African American and White. Hispanic members constitute a relatively small segment of the membership population.
 
 It has neither been alleged nor shown that any racial group constitutes a majority, i.e., more than fifty percent (50%), of the total membership.
 

 7. The Cooperative's Board of Directors had been all White prior to 1966.
 

 8. The first Native American Director was elected to the Board in 1967.
 

 9. The Cooperative had a bi-racial Board of Directors from 1967 through 1971, a tri-racial Board from 1972 through 1982, and a bi-racial Board from 1983 through 1993.
 

 10. As of April 20, 2004, the Cooperative once again operates under the direction of a tri-racial Board of Directors.
 

 . . . .
 

 12. Acting on the recommendations of the [Credentials and Election] Committee, the Board eliminated the "Rule of 4" and will expand the hours of voting.
 

 13. Until the recent elimination of the contested "Rule of Four," the Bylaw rules governing LREMC elections had remained substantively unchanged since at least 1958.
 

 14. As part of a comprehensive update to the LREMC bylaws, and in an effort to address a growing population imbalance among the Director districts, the Board voluntarily re-apportioned its districts and added two (2) new Director seats.
 

 (Emphasis added). On these findings of fact, Judge Floyd entered the following pertinent conclusions of law:
 

 1. North Carolina General Statute § 117-14 grants broad discretionary powers and authorities to a rural electric Cooperative's Board of Directors.
 

 2. Under N.C. Gen.Stat. § 117-17, each North Carolina Cooperative is "vested with all power necessary or requisite for the accomplishment of its corporate purpose and capable of being delegated by the legislature."
 

 . . . .
 

 4. It is not the role of the Court to second-guess the business decisions of a private corporation. Instead, under the applicable business judgment rule, the Court presumes that the Cooperative's Directors conduct their affairs in good faith and in accordance with their fiduciary duties . . . unless there could be no rational basis for the Board's decisions.
 

 . . . .
 

 6. Plaintiffs have failed to demonstrate bad faith by the Board of Directors concerning the establishment, maintenance or amendment of the Cooperative's voting rules. In this regard, Plaintiffs have failed to demonstrate that racial discrimination, relating to any rule of the Cooperative or any conduct by any of the Defendants in this action, is responsible for the transition of the racial composition of the Board of Directors since 1966.
 

 7. Despite requests for the Court to order race-based changes to the Cooperative's election rules, Plaintiffs have failed to demonstrate (1) that Native Americans constitute a racial majority of eligible voting members, (2) that "district only" voting rules would, as a matter of law, serve the Cooperative's best interests, (3) that it would be possible or practical for the Court to draw a District where non-Native American racial groups within the Cooperative's membership would be sufficiently large in number and geographically compact to constitute a majority in such a District, or (4) that African American and White members of the Cooperative are politically active and/or cohesive with regard
 to matters involving their rural electric Cooperative.
 

 Upon these findings and conclusions, Judge Floyd dissolved the 15 March 2004 Order of Judge Butterfield and dismissed Plaintiffs' claims in their entirety.
 

 By their first argument, Plaintiffs contend they presented sufficient evidence that the election of LREMC Board members does not reflect the diversity of the communities served by LREMC in violation of 1999 N.C. Sess. Laws ch. 180, § 8. We disagree.
 

 As noted above, in discussing various amendments to Chapter 117 enacted in 1999, the Editor's Note to §§ 117-6 and 117-13 describes section 8 of these session laws to establish "the intent of the General Assembly that both the election of board members and the hiring of employees of electric membership corporations
 
 should reflect
 
 the diversity of the communities those corporations serve." 1999 N.C. Sess. Laws ch. 180, § 8 (emphasis added). The only mandate contained in the session laws, however, is that electric membership corporations "
 
 shall report
 
 " minority representation on their boards and workforces to the North Carolina Association of Electric Cooperatives so that, in turn, the Association can make the required reports to the legislature.
 

 Id.
 

 (Emphasis added). We note that the General Assembly did not enact any provisions in the General Statutes requiring electric membership corporations to reflect community diversity. Further, the session laws describing the intent of the 1999 amendments do not state that the boards of electric membership corporations
 
 shall
 
 reflect community diversity, nor is there any language sufficient to infer any such requirement contained in the discussion. On the contrary, the only diversity requirement resulting from the 1999 amendments to Chapter 117 is a reporting requirement, and Plaintiffs have made no showing that Defendants failed to report minority representation to the North Carolina Association of Electric Cooperatives. We thus agree with Defendants that, in the absence of a mandate from the legislature, it would have been error for the trial court to create new law regarding the racial composition of the LREMC Board of Directors. Accordingly, we hold that Plaintiffs have failed to present sufficient evidence of a violation of any diversity rule contained in Chapter 117 of the North Carolina General Statutes.
 

 By their second argument, Plaintiffs contend their evidence was sufficient to establish that African-American and white LREMC members are intentionally excluded from the LREMC Board on the ground of race, in violation of the Civil Rights Act of 1964. Plaintiffs base this argument on their position that the methods and "strategies" for electing Board members were operated as a purposeful device to maintain and further racial discrimination. Again, we disagree.
 

 Section 601 of Title VI of the Civil Rights Act of 1964 provides:
 

 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 

 42 U.S.C. § 2000d (2004). It is undisputed that LREMC receives federal funds and is thus subject to Title VI.
 

 Title VI only prohibits
 
 intentional
 
 discrimination.
 
 Alexander v. Sandoval,
 

 532 U.S. 275
 
 ,
 
 121 S.Ct. 1511
 
 ,
 
 149 L.Ed.2d 517
 
 (2001). Although "[d]isproportionate effect may . . . constitute evidence of intentional discrimination[,]"
 
 Hernandez v. New York,
 

 500 U.S. 352
 
 , 375,
 
 111 S.Ct. 1859
 
 ,
 
 114 L.Ed.2d 395
 
 , 416 (1991), we agree with the trial court that, on the evidence presented in this case, Plaintiffs failed to prove that "racial discrimination, relating to any rule of the Cooperative or any conduct by any of the Defendants . . ., is responsible for the transition of the racial composition of the Board of Directors since 1966." We believe that the following evidence supports the trial court's determination:
 

 Until the amendments of the bylaws in 2004, the same voting procedures under which an all Native American Board was elected from 1994 through 7 October 2003 resulted in an all-white Board before 1966, a
 bi-racial Board from 1967 through 1971, a tri-racial Board from 1972 through 1982, and a bi-racial Board from 1983 through 1993.
 

 Two witnesses testified that the biggest factor in gaining a position on the LREMC Board of Directors is hard work: "If you got out and worked, I think most anyone could get a seat on that board." The only evidence Plaintiffs presented which even approached proof of a discriminatory disproportionate effect in the Board's election methods was the testimony of Angus Thompson regarding slates, multi-member districts and submergence of minority groups. As already discussed, however, Mr. Thompson conceded that his testimony related to the racial composition of the population as a whole and not the composition of the LREMC membership. Indeed, Mr. Thompson acknowledged that he had no information or knowledge regarding the percentage of black, white, Hispanic and Native American members of LREMC. In addition, while an estimate of the racial composition of LREMC members in Robeson County appears in the evidence, no evidence was presented to establish the racial composition of LREMC members in its three other county service areas, and there is no evidence that any racial group constitutes a majority of the corporation's total membership.
 

 No witness described any LREMC rule or action by Board members which would permit even an inference, much less prove, intentional discrimination in the election of the LREMC Board of Directors. Plaintiff Ronald Hammonds complained about election methods, but ultimately admitted that he had lost several election bids regardless of whether he followed established election procedures or ran outside the rules. As he put it, "[A]ny way that's possible, I have ran for it." Since Mr. Hammonds is not a member of either racial group that Plaintiffs have identified as victims of racial discrimination, it occurs to us that reasons other than the methods for electing LREMC Board members could explain Mr. Hammonds' lack of success. In any event, Mr. Hammonds also testified that he believes the members of the LREMC Board have tried to do "the very best" in deciding the rules for Board elections. This testimony is undisputed.
 

 Given the evidence which was presented, we agree with Judge Floyd that, at most, Plaintiffs made a "cursory showing" to sustain their position, but failed to make a "sufficient evidentiary presentation" of intentional racial discrimination to survive Defendants' motion to dismiss. Accordingly, we overrule this argument.
 

 Plaintiffs next argue that they presented sufficient evidence of a breach of fiduciary duty by the LREMC Directors in the election of Board members, and that Judge Floyd erred in applying the business judgment rule to this issue. Plaintiffs urge this Court to substitute Delaware common law, as applied to that state's for-profit corporations, for the business judgment rule historically applied in this state to the issue of director liability. For the reasons which follow, we decline to do so.
 

 As described by
 
 Robinson on North Carolina Corporation Law,
 
 the business judgment rule
 

 operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.
 

 Russell M. Robinson, II,
 
 Robinson on North Carolina Corporation Law,
 
 § 14.06, at 14-16-14-17 (2005). Further, this Court has held that the business judgment rule "protects corporate directors from being judicially second-guessed when they exercise reasonable care and business judgment."
 
 HAJMM Co. v. House of Raeford Farms,
 

 94 N.C.App. 1
 
 , 10,
 
 379 S.E.2d 868
 
 , 873,
 
 review on additional issues allowed,
 

 325 N.C. 271
 
 ,
 
 382 S.E.2d 439
 
 (1989),
 
 and modified, aff'd in part, rev'd in part on other grounds,
 

 328 N.C. 578
 
 ,
 
 403 S.E.2d 483
 
 (1991). Noting the
 broad discretionary powers granted to a rural electric cooperative's board of directors under N.C. Gen.Stat. §§ 117-14 and 117-17, including the power to regulate the election of Board members, and applying the foregoing principles of the business judgment rule to the issue of whether the LREMC Directors breached their fiduciary duties in the establishment, maintenance or amendment of election rules, Judge Floyd presumed "that the Cooperative's Directors conduct[ed] their affairs in good faith and in accordance with their fiduciary duties." He thus determined that the trial court had no authority to intervene in the private affairs of the LREMC Board "unless there could be no rational basis for the Board's decisions." Judge Floyd further determined that Plaintiffs "failed to demonstrate bad faith" on the part of the LREMC Board members.
 

 We note, first, that Judge Floyd clearly understood the principles of the business judgment rule and correctly applied those principles to the issue before him. Second, his determination is overwhelmingly supported by the evidence presented by Plaintiffs. For example, as set out above, Plaintiff Ronald Hammonds testified that the Board members "in their own conscience and mind . . . done the best they could under the circumstances" in setting bylaw election rules. There is no evidence to the contrary. Additionally, Mr. Hammonds' testimony establishes that, prior to 2004, the Directors failed to accept recommendations from the Credentials and Election Committee to abolish the "Rule of Four" because they mistakenly believed that they were prohibited from doing so under the terms of a prior lawsuit. Further, as soon as a complaint was made that the time for conducting the election was too short, the Board agreed to extend the time. Similarly, when the LREMC staff and attorneys recommended increasing the number of Directors to address customer growth, the Board immediately acted to do so and, upon the additional recommendation to appoint one white and one African-American to the new Board positions, the Directors did just that, after considering the qualifications of the proposed new members. In our view, given the evidence presented, Judge Floyd could have reached no other determination than that Plaintiffs failed to demonstrate bad faith on the part of the LREMC Board members and that the presumption accorded their actions under the business judgment rule prevented the Board from being "judicially second-guessed."
 

 Id.
 

 Finally, we agree with Defendants that N.C. Gen.Stat. § 117-14 (a rural electric cooperative board of directors "shall have power to do
 
 all things necessary or convenient
 
 in conducting the business of a corporation[]") and § 117-17 ("[e]ach corporation formed under this Article is hereby vested
 
 with all power necessary or requisite for the accomplishment of its corporate purpose and capable of being delegated by the legislature
 
 []") (emphasis added) unequivocally establish the legislature's intent that a "rule of deference,"
 
 i.e.,
 
 the business judgment rule, be applied to restrict judicial oversight of the actions of rural electric cooperative Board members unless there is no rational basis for the Board's decisions. Absent evidence of a contrary legislative intent, such as statutory limitations on the powers of the Board, we reject Plaintiffs' argument that the trial court applied the wrong standard in its evaluation of the LREMC Board's election procedures, and we decline to adopt the Delaware common law standard of "enhanced judicial scrutiny" for evaluating the actions of Board members under Chapter 117. (
 
 See, e.g., MM Companies, Inc. v. Liquid Audio, Inc.,
 

 813 A.2d 1118
 
 , 1131 (Del.Supr.2003)).
 

 We next consider Plaintiffs' fourth argument, that they presented sufficient evidence of racial discrimination in the election of LREMC Board members in violation of the nondiscrimination statement contained in the LREMC bylaws. Even if we accept Plaintiffs' argument that the Title VI statement printed on the inside page of the front cover of the bylaws constitutes an actual bylaw term, which Defendants dispute, we are of the opinion that this argument has no merit for the reasons discussed above in response to Plaintiffs' second argument. The mere fact that Plaintiffs characterize this argument as a breach of contract claim does not provide the evidentiary support necessary for a determination of intentional racial discrimination. On the contrary, as previously discussed,
 the evidence fully supports Judge Floyd's determination that Plaintiffs failed to prove "that racial discrimination, relating to any rule of the Cooperative or any conduct by any of the Defendants in this action, is responsible for the transition of the racial composition of the Board of Directors since 1966." This argument is overruled.
 

 By their fifth and final argument, Plaintiffs contend their evidence was sufficient to establish that Defendants violated the preliminary injunction entered by Judge Butterfield in his order of 15 March 2004 enjoining Defendants from "scheduling or conducting any further elections for the Board of Directors until a trial on the merits." Specifically, Plaintiffs argue that Defendants should have been held in contempt for creating two new Board seats as part of the bylaw amendments adopted in April 2004 and then filling those seats with one white and one African-American member. In support of their position that these actions by the LREMC Board violated the preliminary injunction, Plaintiffs cite N.C. Gen.Stat. § 117-13 which provides, in pertinent part, that "[e]ach corporation formed under this Article shall have a board of directors [who] shall be elected annually by the members entitled to vote[.]" For the following reasons, we find no merit to this argument.
 

 Included in the sweeping power granted to a rural electric cooperative board of directors under N.C. Gen.Stat. § 117-14 is "[t]he power to adopt and amend bylaws . . . [including] provisions . . . defining a vacancy in the board . . . and the manner of filling it[,]" so long as those provisions are "not inconsistent with law or [the cooperative's] certificate of incorporation[.]" The Record on Appeal in this case contains a copy of the LREMC bylaws, as amended in July 2001, and the LREMC bylaws, as amended in April 2004. Plaintiffs do not challenge any terms of the July 2001 bylaws. Instead, Plaintiffs argue that the Board improperly added two new seats under the April 2004 amendments and then improperly filled those seats through an "election" by Board members rather than an election by the cooperative's membership. We note, however, that even under the bylaws as they existed before April 2004, the LREMC Board had the authority to "fill any vacant Director position,
 
 including any vacant Director position resulting from increasing the number of Directors[,]
 
 " by the affirmative vote of a majority of the remaining Directors. LREMC Bylaws, As Amended July 2001, § 4.09 (emphasis added). Although the 2004 amendments changed the bylaw language, the Board's authority to fill a vacant Director position, including a vacancy created by an increase in the number of Directors, "by the affirmative vote of a majority of the remaining Directors," remained unchanged. LREMC Bylaws, As Amended April 2004, § 5.10. This authority is granted to the Board by N.C. Gen.Stat. § 117-14. The LREMC certificate of incorporation is not included in the Record on Appeal, and Plaintiffs do not argue that the bylaw provisions which give the Board the authority to increase the number of Directors and fill vacancies thus created are inconsistent with the certificate of incorporation. Additionally, Plaintiffs cite no authority, other than N.C. Gen.Stat. § 117-13, that these bylaw provisions are inconsistent with law.
 

 Plaintiffs' reliance on N.C. Gen.Stat. § 117-13 is misplaced. Clearly, the general terms of this provision of Chapter 117 are modified by the specific terms of
 
 N.C. Gen. Stat. § 117-14
 
 with respect to the particular powers granted to the Board by the latter provision. Those powers include defining a vacancy in the board and the manner of filling it. Additionally, Chapter 55A of the General Statutes, the North Carolina Nonprofit Corporation Act, specifically allows the board of directors of a nonprofit corporation to fill "a vacancy resulting from an increase in the number of directors[.]" N.C. Gen. Stat. § 55A-8-11(a)(2) (2005). Moreover, Chapter 55A recognizes the distinction between an election by the membership and appointment by the board: "If the corporation has members entitled to vote for directors, all the directors . . . shall be elected at . . . each annual meeting . . .,
 
 unless
 
 the. . . bylaws
 
 provide some other time or method of election, or provide that some of the directors are appointed by some other person.
 
 . . ." N.C. Gen.Stat. § 55A-8-04(a) (2005) (emphasis added). When these provisions of Chapter 55A are construed
 
 in pari
 

 materia
 
 with N.C. Gen.Stat. §§ 117-13 and 117-14, it is plain that the Board of Directors of LREMC (1) has the authority to appoint directors to fill vacant director positions, including vacancies created by increasing the number of directors on the Board, and (2) in appointing directors to fill the two new seats added in April 2004, the LREMC Board did not violate the terms of Judge Butterfield's 15 March 2004 injunction.
 

 In this case, "[h]aving conducted a full hearing of Plaintiffs' claims and determining that the same are not supported by fact or applicable law," Judge Floyd dissolved the 15 March 2004 order. Implicit in this determination is Judge Floyd's denial of Plaintiffs' motion to hold Defendants in contempt. Our standard of review of Judge Floyd's order on this issue is "whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law."
 
 Sharpe v. Nobles,
 

 127 N.C.App. 705
 
 , 709,
 
 493 S.E.2d 288
 
 , 291 (1997) (citation omitted). For the reasons discussed above, we affirm the trial court's order denying Plaintiffs' contempt motion and dissolving the preliminary injunction.
 

 Finally, we are compelled to address the following: During oral argument, Plaintiffs asserted that to affirm Judge Floyd's order would be to endorse and condone racial discrimination. A charge of racial discrimination is not something that this Court takes lightly and not something that should be asserted absent thorough, competent evidence. By affirming Judge Floyd's order, in no way do we demonstrate that this Court endorses, condones, or tolerates racial discrimination in any form. Rather, we affirm the decision below because, under the applicable standard of review, Judge Floyd's findings of fact are supported by competent evidence presented for his consideration, and his findings of fact support his conclusions of law.
 

 The evidence presented before the trial court and reviewed by this Court through lengthy transcripts and documentary exhibits in no way demonstrates racial discrimination. On the contrary, all Plaintiffs were able to provide were accusations, speculation, and conjecture. Had Plaintiffs been able to present adequate evidence, they may have received a more favorable result. Absent such evidence, this Court will not be persuaded by an idle, seemingly offhanded remark.
 

 AFFIRMED.
 

 Chief Judge MARTIN and Judge WYNN concur.
 

 We reject Plaintiffs' argument that our standard of review is to determine whether there is more than a scintilla of evidence to support all the elements of a prima facie case in Plaintiffs' favor, as that is the standard of review applied to rulings under Rule 50(a).
 

 The interim report of the Association was due to the Legislature by 16 June 2001, and the final report was due two years later.