Gerald **MADVIG**, Derivatively on Behalf of Nominal Defendant Ingles Markets, Inc., Plaintiff,

v.

Charles L. **GAITHER**, Jr.; Robert P. Ingle; Robert P. Ingle, II; James W. Lanning; John O. Pollard; Charles E. Russell; Laura Ingle Sharp; Brenda S. Tudor; and J. Alton Wingate, Defendants,

and

**Ingles Markets, Inc., Nominal Defendant.**

No. 1:05 CV 234.

United States District Court, W.D. North Carolina, Asheville Division.

Oct. 11, 2006.

K. Stacie Corbett, Charlotte, NC, Terence James Rasmussen, Hunton & Williams, LLP, Richmond, VA, for Defendants.

## MEMORANDUM OF DECISION

HOWELL, United States Magistrate Judge.

**THIS MATTER** is before the court in accordance with 28, United States Code, Section 636(c), and on defendants' Motion to Dismiss (# 11). Subsequent to the filing of the motion to dismiss, the court allowed upon motion discovery as to the statutory Motion to Dismiss, which was duly completed. At the conclusion of such discovery period, plaintiff filed his Memorandum in Opposition to Defendants' Motion to Dismiss (# 48) which was supported by exhibits. On July 25, 2006, defendants' timely filed their reply (# 50), which closed briefing. Plaintiff moved for a hearing (# 51), which defendants did not concur in (# 52), and which the court allowed. (# 54)

On August 24, 2006, counsel for the parties appeared and oral arguments were heard. At the conclusion of the hearing, the court took the matter under advisement to consider the arguments alongside the pleadings. Having carefully considered the well reasoned and well presented arguments of all counsel, the court enters the following findings, conclusions, and decision, which allows defendants' motion and dismisses this action with prejudice. A Judgment consistent with this Memorandum of Decision is being entered simultaneously herewith.

## FINDINGS AND CONCLUSIONS

### I. Background

#### A. The Action

This is a shareholder's derivative action, whereby plaintiff seeks on behalf of the shareholders to have the company sue its directors for what plaintiff contends is malfeasance or misfeasance that resulted in loss to the corporation.

Plaintiff is a shareholder of nominal defendant Ingles Markets, Inc. ("Ingles"), Complaint, at ¶ 5. Ingles is a North Carolina corporation that owns and operates supermarket stores in Alabama, Georgia, North Carolina, South Carolina, Tennessee, and Virginia. Declaration of K. Stacie Corbett ("Corbett Dec."), Ex. 1, at 24. The individual defendants are all directors and/or officers, former directors and/or officers, or now deceased[1] former directors/officers of Ingles.

---

1. The court notes that suggestions of death have been made on the record and that no

**B. The SEC Inquiry, the Demand Letter, and Ingles' Restatement of Earnings**

On February 11, 2005, a demand letter by plaintiff's counsel was sent to the Chairman of the Board of Directors of Ingles, defendant Robert P. Ingle, II. Corbett Dec., at Ex. 2 ("Zagar Demand Letter"). Such letter was sent in accordance with Chapter 55–7–42 of the North Carolina General Statutes, which requires that an aggrieved party first send a written demand to take suitable action to the corporation prior to filing a shareholder derivative action. N.C.Gen.Stat. § 55–7–42. In the letter, it was alleged that misconduct had occurred in the form of accounting errors, Zagar Demand Letter, at 1, which was in turn based on a December 6, 2004, disclosure by Ingles that the Securities and Exchange Commission ("SEC") had initiated an informal inquiry into Ingles' accounting for a vendor contract. Corbett Dec., Ex. 1, Ex. D., Ingles Form 10–K, at 3.

On February 3, 2005, Ingles disclosed that its Audit Committee (which was tasked with conducting an internal investigation of the SEC inquiry) had uncovered certain accounting errors that would require restatement of quarterly earnings. *Id.*, Ex.1,Ex. C. The errors included corporate recognition of vendor allowances, other revenue, as well as expense items in incorrect accounting periods. *Id.*, Ex. 1, Ex. C., at 2. In the press release, Ingles announced that "[a]s a result of the change in recognition of certain vendor allowances, fiscal year 2004 net income was increased by approximately $1.3 million which had been previously recorded in prior periods ...." *Id.* On February 11, 2005, Ingles restated its financial statements for fiscal years 2002 and 2003. *Id.*, at Ex. 1, Ex. D,

Ingles Form 10–K, at 2. As a result, Ingles' net income for 2002 was decreased by $2.2 million and for 2003 was increased by $24,000.00. *Id.*, at 44.

In the demand letter, plaintiff contended that defendants as directors and officers of Ingles bore the responsibility for the consequences of the restatement by knowing approval of or gross negligence in failing to prevent and correct Ingles' improper financial reporting and accounting practices. *Id.*, at Ex. 2. Based on such contentions, plaintiff urged Ingles to pursue legal action against the defendants.

**C. Ingles Establishes a Special Committee to Investigate Whether the Derivative Action Plaintiff Demanded is in the Company's Best Interest**

In accordance with North Carolina law, when a company receives a demand letter requesting that a derivative action be filed, the Board of Directors is authorized to establish a special committee of independent directors to determine through majority vote, and after conducting a reasonable inquiry, whether maintenance of a derivative proceeding is in a company's best interests. N.C.Gen.Stat. § 55–7–44(a) & (b). In accordance with that provision, the Board of Directors of Ingles established the Special Committee and appointed Defendants Pollard, Russell, and Wingate to serve thereon. Corbett Dec., at Ex 1. Defendant Wingate died in August 2005 after resigning from the Special Committee. *Id.*, at 21.

This Special Committee began its investigation by employing the firm of *Alston & Bird LLP* to assist with the investigation. With advice from such firm, the Special Committee first determined that it was

---

motions for substitution of parties under Fed. R.Civ.P. 25 have been made, which may enti-

tle the administrators of the estates of such parties to dismissals.

sufficiently independent and disinterested so as "to evaluate the allegations in the [Complaint] in good faith and to conduct an adequate investigation." *Id.,* at 20. Thereafter, the Special Committee took the following actions:

(1) it authorized an investigative work plan, *id.,* at 22;

(2) it and its counsel interviewed three individuals with knowledge and obtained affidavits from eight others, *id.;*

(3) it and its counsel conducted a document review, including analysis of the price variability of Ingles' common shares, accounting rules, statutes, and case law, *id.,* at 23;

(4) investigated potential claims against two former officers, who were involved in matters contributing to the restatement, but not named in the demand letter, *id.,* at 4; and

(5) reviewed legal memoranda and received legal advice from counsel, *id.,* at 22.

In addition, the Special Committee met with counsel ten times to discuss the investigation. *Id.*

### D. Plaintiff Filed His Complaint Before the Special Committee Competed it Investigation

Plaintiff filed the instant Complaint on June 15, 2005, alleging the following causes of action:

(1) Breach of Fiduciary Duty against the Individual Defendants;

(2) Unjust Enrichment against the Corporate Officer Defendants; and

(3) a Claim for Reimbursement of Compensation against defendants Robert P. Ingle, Sr., and Brenda Tudor, under the *Sarbanes–Oxley Act of 2002.*

Plaintiff seeks monetary damages for such alleged acts.

### E. The Special Committee Completes Its Investigation

While the report itself is undated, it was received by this court on October 10, 2005. *See* Docket Entry 24. In the fifty one page report, the Special Committee concluded and determined that

it is not in the best interests of Ingles to continue the prosecution of the claims asserted in the Derivative Action, or to assert claims against other directors or officers regarding the mistakes that occurred with respect to accounting for certain operating leases and vendor allowances.

Corbett Dec., Ex. 1, at 51. The Special Committee based such determination on findings that (1) there was no evidence to support plaintiffs' claims because defendants acted in good faith, (2) plaintiff's Complaint was based on questionable legal theories (including concern as to whether North Carolina law would recognize the cause asserted in Count One and concern that *Sarbanes–Oxley* did not provide the private right of action plaintiff attempted to assert in Count Three),(3) possible defenses, including an exculpatory provision in Ingles' charter, (4) questionable damages, and (5) costly and disruptive litigation. *Id.,* at 40 –51.

### II. Standard Applicable to Statutory Motions to Dismiss Derivative Actions

It is undisputed that North Carolina has purposefully designed its corporate law to be most favorable to businesses that incorporate under North Carolina law. In North Carolina, it is the board of directors that manages the corporation, not the shareholders, N.C.Gen.Stat. § 55–8–1, and it is entirely up to the board of directors to exercise all corporate powers, including the authority to initiate legal action on

behalf of the corporation. N.C.Gen.Stat. 55–2–2(a)(1).

Such absolute investiture of power also extends to decisions concerning whether derivative actions should be pursued. N.C.Gen.Stat. 55–7–44(a). Under North Carolina law

> The court shall dismiss a derivative proceeding on motion of the corporation if one of the groups specified in subsection (b) or (f) of this section determines in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interest of the corporation.

*Id.* The inquiry of a court reviewing the corporation's decision not to pursue the proposed litigation is limited to determining whether:

> (1) the decision was made by "a committee consisting of two or more independent directors," N.C.Gen.Stat. § 55–7–44(b)(2);
>
> (2) a reasonable inquiry was conducted; and
>
> (3) the decision was made in good faith.

Each area of inquiry will be addressed below.

## III. Discussion

### A. Independence

The first inquiry is whether the Special Committee was comprised of two or more independent directors. At the time the Special Committee was formed, it had three members, and when it returned the report it had two board members. Thus, the numerosity requirement is satisfied on the face of the report, leaving the issue of independence.

A director is determined to be independent where he or she is capable of making a decision in the corporation's interest, rather than some other interest, such as their own personal interests. *First Union Corp. v. Suntrust Banks, Inc.,* No. 01–8036, 2001 WL 1885686, *32 (N.C.Super. August 10, 2001).[2] North Carolina law excludes, however, three factors from impacting a director's independence, which include election of the director by persons who are defendants in the derivative proceeding, the naming of the director as a defendant in the derivative proceeding, and approval by the director of the challenged act if the challenged act resulted in no personal benefit to the director. N.C.Gen.Stat. § 55–7–44(c).

It is undisputed that the Special Committee consisted of "outside directors," that is, directors who were not also officers or employees of Ingles. Corbett Dec., Ex. 1, at 25–26. Such members had no material financial stake in continuing their roles as directors of Ingles inasmuch as their compensation was limited to meeting fees, which were relatively nominal. The Special Committee inquired with the assistance of counsel into the issue of independence and determined that the members were "sufficiently independent and disinterested" so as to conduct an "adequate investigation." *Id.,* at 20. It is undisputed that the committee members disclosed to each other and to counsel any relationships they had with Ingles and its current or former officers and directors, and such were determined to be immaterial and would not impact the members' abilities to conduct an impartial investigation. *Id.* Fi-

---

**2.** Due to the limits of electronic filing, such unpublished decision is incorporated into the file by reference to the Westlaw citation. The court also notes that this court finds the opinions of the Business Court to be particularly persuasive on issues concerning North Carolina business laws and practices.

nally, the Special Committee retained and relied on the advice of experienced outside counsel.

### 1. Russell

Plaintiff argues that Special Committee member Russell was not independent on four grounds. None of these arguments have merit for the following reasons.

First, plaintiff argues that Russell was not independent because he was asked to join the Company's board of directors in 2001 by two sitting directors. This argument is meritless as a matter of law because Chapter 55-7-44 of the North Carolina General Statutes specifically provides that a director shall not be disqualified from serving on a special committee due to the "nomination or election of the director by persons who are defendants in the derivative proceeding." N.C.Gen.Stat. § 55-7-44(c). The on-the-ground reality is that people serve on corporate boards based on personal and professional relationships with present members of the board. If such were to be a disqualifying factor, then any board would be hard-pressed to form a Special Committee, thereby wresting control of the corporation away from the corporate board.

■ Second, plaintiff also appears to argue Russell lacks independence because his former accounting firm once provided auditing services to Ingles Markets and tax services to Mr. Ingle personally. Pl.'s Response, at 11–12. Foremost, such professional services were not rendered in close temporal proximity to the claim plaintiff has made, and appear to have been last provided some 20 years ago. Deposition of Charles E. Russell ("Russell Depo."), at 6. It is undisputed that such professional relationship was disclosed by Russell to the Special Committee and counsel, and the Special Committee concluded that this two decades-old relation-

ship would not affect Russell's ability "to make an independent determination." Corbett Dec., Ex. 1, at 20. Indeed, it appears that Russell's professional services were terminated some 20 years ago in favor of a national accounting firm when Ingles went public, an event which weighs against plaintiff's argument.

■ Third, plaintiff argues that Russell's accounting firm employed Defendant Tudor for two years in the early 80's and that Russell referred to Defendant Tudor in his deposition as a "friend." Pl.'s Response, at 12. From that testimony, plaintiff extrapolates that Russell's relationship with Tudor "seriously undermined his independence." Id., at 12–13. This relationship does not come as a shock to the court, and does not lead it to agree that being friends or employing fellow board members in the distant past "undermined" independence. The court presumes that the common interests which bring a board together will naturally include professional and social relationships; likewise, it cannot be assumed that such relationships undermine the independence of such members. See Beam v. Stewart, 845 A.2d 1040 (Del. 2004). As the North Carolina Business Court has held, allegations that social and professional relationships exist among board members, without more, raise no presumption that such relationships improperly influenced a committee member's decision. Marcoux v. Prim, No. 04–920, 2004 WL 830393, at *16 (N.C.Super. Apr. 16, 2004). Apparently, plaintiff's concern also stems from business lunches Russell had with Tudor, at which accounting issues were discussed. To hold that discussing company business, even business that might be related to this lawsuit, somehow disqualifies a director from a Special Committee would simply be absurd inasmuch as discussing company business is one of the primary missions of any director.

■ Fourth, plaintiff claims that Russell lacked independence because when confronted with differing versions of events in one instance, the Special Committee purportedly credited Tudor's version over the version of Mr. Federico. Foremost, both the Special Committee and the SEC found Mr. Federico to be the primary wrongdoer in this case. When discrediting testimony, there is a duty of explanation. *See generally Hatcher v. Secretary,* 898 F.2d 21, 23 (4th Cir.1989) in making credibility determinations, "such decisions should refer specifically to the evidence informing the ... conclusion." Russell explained in his deposition that this decision was not based on personal affinities but on "evidence that was firm":

> You asked me if ... my call on [Ms. Tudor's] credibility was [an] issue of deciding between two individuals.... It wasn't a call. [Ms. Tudor had] notified the audit committee about Mr. Federico's actions ... when she discovered those. And they were discovered in the normal course of ... business.... So it was not like we were just deciding between two individuals[,] [Ms. Tudor and Mr. Federico]. We were deciding between some evidence that was firm.... So it wasn't a 'call.' It was a ... fact-finding decision that supported her credibility.

Russell Depo., at 37–38. Indeed, the Special Committee explained this credibility determination in its report by explaining that they credited Ms. Tudor's testimony in part because of her "actions in identifying [the vendor allowance] problems and her overall demeanor...." and because the former employee refused to be interviewed about the events. Corbett Dec., Ex. 1, at 36.

The court cannot find that Russell was anything other than independent.

### 2. Pollard

■ The other surviving Special Committee member is Mr. Pollard. Plaintiff attacks Pollard's independence on two grounds.

First, plaintiff claims that Pollard lacked independence because he was "asked by Ingle to join the Board." Pl.'s Response, at 13. As with the argument asserted against Russell, this argument fails as a matter of North Carolina law as barred by Section 55–7–44(c) of the North Carolina General Statutes.

Second, plaintiff claims that Pollard lacked independence because his former law firm, *McGuireWoods LLP,* "has performed work for Ingles [Markets]." Pl.'s Br., at 13. This argument is little different from the argument concerning Russell's accounting firm. The record is undisputed that Pollard has not done any work for Ingles Markets since 2003, during which year he represented Ingles in one labor matter for which *McGuireWoods* received fees of only $6,175.00. Pollard divulged such relationship and the committee as well as counsel determined it did not impact his ability to serve. It is equally undisputed that Pollard did not gain financially from his representation inasmuch as he was a non-equity partner, Corbett Dec., at 20, f.n. 10, and simply providing legal representation does not show a lack of independence. *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 360 (Del.Ch. 1998), *rev'd in part on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000). Plaintiff's claim that Mr. Pollard had a "lucrative financial relationship" with Ingles, Pl.'s Response, at 14, is, therefore, without legal or factual merit.

In addition to the allegation concerning Pollard's work in representing Ingles, plaintiff also ascribes a lack of independence based on the work Pollard's former law firm *McGuireWoods* performed for In-

gles from 1974 to the present. Pl.'s Response, at 13. North Carolina's Business Court has addressed this issue, holding that "[l]egal fees from the corporation must be substantial in proportion to the size of the [law] firm to rebut the presumption that a director is independent." *Marcoux, supra,* at *16. In relevant years, the percentage of *McGuireWoods'* yearly revenue attributable to Ingles in 2003 and 2004 was 0.0003 percent and 0.0002 percent, respectively. Special Comm. Notebook, Tab 3, at 2. While this court understands that each client is important to a law firm, even if *McGuireWoods* lost Ingles as a client, such a loss would likely go unnoticed from a financial perspective. Such fees, therefore, are clearly not substantial.

### 3. Collective Review of Plaintiff's Arguments

The North Carolina Business Court in *In re Pozen Shareholders Litigation,* No. 04–1540, 2005 WL 3035783 (N.C.Super. Nov. 10, 2005) provided guidance in making a collective and overall review of the plaintiff's contentions. In *Pozen,* the court was faced with a similar list of allegations and determined that plaintiff had failed to show that the directors could not have exercised "independent and disinterested business judgment." *Id.,* at*15. As shown above, plaintiff's allegations lack merit when considered individually; when considered together, the court is reminded of the adage that the whole cannot exceed the sum of its parts. Plaintiff's allegations, even when considered together, are no different from those rejected in *Pozen,* and this court finds that both Russell and Pollard acted independently.

### B. Reasonable Inquiry

What constitutes a reasonable inquiry is judged from the magnitude of the issue raised. Russell M. Robinson, II, *Robinson on North Carolina Corporation Law,* § 17.08 (2005). To be reasonable, the inquiry must be commensurate in scope with the nature of the issues raised by the complainant. *Id.*

■ The court has read the report of the Special Committee in its entirety alongside the demand letter, as well as the Complaint. The court finds that the Special Committee's inquiry was more than commensurate in scope with the concerns plaintiff raised in his demand letter as well as his Complaint. Not only did the Special Committee announce its determination that the proposed lawsuit was not in the best interests of the company, it explained the basis for its decision, which included findings that (1) there was no evidence to support plaintiffs' claims because defendants acted in good faith, (2) plaintiff's Complaint was based on questionable legal theories (including concern as to whether North Carolina law would recognize the cause asserted in Count One and concern that *Sarbanes–Oxley* did not provide the private right of action plaintiff attempted to assert in Count Three),(3) possible defenses, including an exculpatory provision in Ingles' charter, (4) questionable damages, and (5) costly and disruptive litigation. Corbett Dec., Ex. 1, at 40 –51. Further, the investigation went beyond the allegations of the demand letter and Complaint and investigated potential claims against two former officers of Ingles. *Id.,* at 4. In addition, the Special Committee employed and consulted with experienced outside counsel, which further supports the reasonableness of the inquiry. *Drilling v. Berman,* 589 N.W.2d 503, 509 (Minn.Ct. App.1999).

Plaintiff has challenged the reasonableness of the Special Committee's inquiry arguing that (1) not enough interviews

were conducted and (2) the Special Committee's counsel was not independent.

## 1. Interviews

 Plaintiff's challenge to the number of interviews is fatally flawed because it is not coupled with an argument that the Special Committee failed to devote adequate time and resources to its investigation, that it identified issues that it failed to pursue aggressively, or that it failed to identify key issues in the first instance.

Apparently, plaintiff believes that the Special Committee should have conducted interviews of those individuals from whom they obtained sworn statements. It is undisputed, however, that the Special Committee had access to and relied on interviews conducted by the Audit Committee of several of the individual defendants. It is equally undisputed that Russell and Pollard conducted these earlier interviews. The court can find no requirement in the statute that corporations must waste time and money conducting redundant interviews. The Special Committee: (i) reviewed the prior interviews, which had been conducted recently under the direction of its own members; (ii) determined that a third interview of Tudor was necessary and conducted that interview; (iii) determined that interviews with the two *Ernst & Young* accountants responsible for the Ingles Markets engagement were necessary and conducted those interviews; (iv) attempted unsuccessfully to interview Mr. Federico, who refused to cooperate with the investigation; and (v) obtained affidavits from the Individual Defendants, several of whom had been interviewed already. The court cannot find such to lacking in any manner, and plaintiff fails to explain how this process was unreasonable. Section 55–7–44(a) requires only an "inquiry," which means "to

inquire," a task which the Special Committee most certainly accomplished.

## 2. Independence of Counsel

 Plaintiff also challenges the independence of counsel because such counsel served the previously composed Audit Committee, which conducted the initial investigation of the SEC charge. There is however, no allegation or showing that counsel acted in an advocacy role in defending against those SEC charges; instead, it appears from the face of the materials that counsel acted in the same role for both committees, that of an investigator or fact finder. There being no inherent conflict in serving in such capacity for both committees, and plaintiff having failed to present any indicia of an actual conflict or of *Alston & Bird* engaging in any manner of advocacy either before the SEC or this court in this matter, the court finds such argument to be without merit.

## 3. Consideration of Allegations Together

Even when considering all the allegations of an unreasonable inquiry together, the court finds no merit to plaintiff's allegations. The Report of the Special Committee provides this court with ample evidence that the Special Committee conducted, at a minimum, the inquiry required by the statute.

## C. Good Faith

 The final inquiry asks whether the Special Committee acted in good faith. Robinson has defined "good faith" in the corporate setting as a decision that is made "honestly, conscientiously, fairly, and with undivided loyalty to the corporation." *Robinson, supra,* at § 14.02. Further, such good faith requirement is the foundation of

the business judgment rule, which has full force and effect in North Carolina:

> the business judgment rule operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

*Id.*, at § 14.06. North Carolina courts have consistently held that "the business judgment rule protects corporate directors from being judicially second-guessed when they exercise reasonable care and business judgment." *Hammonds v. Lumbee River Elec. Membership Corp.*, 631 S.E.2d 1, *13 (N.C.App.2006) (citation and corresponding quotation marks omitted). On the other hand, in a shareholder derivative action, directors on a Special Committee act in bad faith where the committee's investigation was "so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham." *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 1003 (1979).

Beyond the presumption which arises under North Carolina law that the actions of the Special Committee were taken in good faith, the overwhelming evidence before this court is the extensive Report that documents the Special Committee's investigation as well as its findings. Such Report documents that the Special Committee interviewed witnesses it considered relevant to the allegations, secured written statements from others, closely reviewed the transactions that caused the restatement of earnings, and went beyond plaintiff's allegations to investigate additional claims. Such an investigation is, on its face, a thorough consideration of the potential causes of action Ingles might have had against defendants.

In addition, the directors on the Special Committee submitted sworn affidavits—placing their own liberty interests on the line—that they would act in the best interests of the company. Corbett Dec., Ex. 1, Ex. F., & Ex. G. Further, the Special Committee employed and actively used independent, experienced counsel, which also weighs in favor of a finding of good faith.

Plaintiff challenges the "good faith" of the Special Committee by arguing that Russell and Pollard are (1) defendants in this action and (2) were members of the audit committee. These claims are wholly without merit in showing a lack of "good faith."

As discussed above, plaintiff named all member of the Ingles' Board of Directors as defendants in this action. The Special Committee is, necessarily comprised of defendants, a fact which is solely attributable to plaintiff's pleading. Again, plaintiff's argument flatly *ignores* North Carolina law (cited *supra*) that holds that the status of a director as a defendant in the action does not undermine his eligibility to serve on the Special Committee.

As to being members of the Audit Committee, such fact has absolutely *zero* impact on whether a person can act, serve, and render an opinion in "good faith" as a member of a special committee composed to investigate a derivative action. Indeed, the only evidence on point is the deposition testimony of Pollard, who when asked if his roles on the Audit Committee conflicted with his work on the Special Committee answered "No." Deposition of John O. Pol-

lard, at 17–18. When asked to explain, Pollard stated "I felt I could be objective about it." *Id.*, at 18.

## IV. Conclusion

Ultimately, what this court has been tasked with determining is whether the Special Committee's decision, that it would not be in the best interests of Ingles to proceed with the litigation against defendants, was arrived at fairly. Put another way, the court's role is to determine whether a corporation's decision to dismiss an action was arrived at based on personal rather than corporate best interests in mind. The Report of the Special Committee has left this court with no doubt that Ingles wants no part of plaintiff's litigation, not for the sake of its board, but for the sake of its stockholders. The Report makes clear that it is the business judgment of the Special Committee that there is little merit to plaintiff's claims, little chance of any recovery, a certainty of high defense costs, and that the stockholders are likely to be harmed by the adverse publicity such an action would certainly generate.

Not only does this court have in the record the Report, it also has the report of the Security and Exchange Commission issued April 27, 2006. The SEC, a federal regulatory agency with independent prosecutorial authority, determined as follows:

> [t]he responsible individual [for the accounting problems] was Anthony S. Federico, now deceased.... Federico negotiated refundable, upfront payments with vendors at or after the end of certain quarters. Federico then papered the transactions to make it look like the money was nonrefundable and for past performance. Senior management was not aware of Federico's false documents.

*See* Second Declaration of K. Stacie Corbett ("Corbett Dec. II"), Ex. 1, at ¶ 2. The SEC brought no charges and levied no fines against the individual defendants. Thus, it is reasonable to conclude that it would be next to impossible to ascribe to the individual defendants knowledge, much less responsibility, for the unlawful acts of a rogue corporate officer who is now deceased.

In addition, not only does the decision of the Special Committee comport with North Carolina law, it appears to comply with Rule 11, Federal Rules of Civil Procedure. When the Report of the Special Committee is compared with Rule 11, it would appear that Ingles could not now, in good faith, champion this litigation inasmuch as Ingles could not certify that

> the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery ....

Fed.R.Civ.P. 11(b)(3).

Finally, plaintiff has argued that if his arguments are not sufficient individually, then they should be considered together as a basis for allowing this suit to move forward. While such a review does not appear to be required by North Carolina law, the court has also considered plaintiff's arguments together, considering the totality of the circumstances both presented and argued by plaintiff. When considered together the result is, however, no different inasmuch as the Report of the committee, as well as their determination, was the result of an inquiry made by a committee comprised of independent, outside board members, who with the assistance of independent, outside counsel conducted a "reasonable inquiry" that *exceeded* plaintiff's allegations. Where the committee made credibility determinations, it fulfilled its duty of explaining why one person's story was given more credence than another's

version. Indeed, every aspect of the report had earmarks of a committee determined not only to comply with the statute, but to determine what was in the best interests of Ingles.

In the end, the decision of the Special Committee was clearly made with the best interests of Ingles in mind. The Special Committee specifically found that

> it is not in the best interests of Ingles to continue the prosecution of the claims asserted in the Derivative Action, or to assert claims against other directors or officers regarding the mistakes that occurred with respect to accounting for certain operating leases and vendor allowances.

Corbett Dec., Ex. 1, at 51. The Special Committee based such determination on findings that (1) there was no evidence to support plaintiffs' claims because defendants acted in good faith, (2) plaintiff's Complaint was based on questionable legal theories (including concern as to whether North Carolina law would recognize the cause asserted in Count One and concern that *Sarbanes–Oxley* did not provide the private right of action plaintiff attempted to assert in Count Three),(3) possible defenses, including an exculpatory provision in Ingles' charter, (4) questionable damages, and (5) costly and disruptive litigation. *Id.,* at 40 –51.

Indeed, pursuing such litigation against these defendants could well have resulted in sanctions under Rule 11 inasmuch as both the Special Committee and the SEC drew essentially the same conclusion, that "[s]enior management was not aware of Federico's false documents." Corbett Dec. II, *supra.* While plaintiff has asked Ingles to bring an action against its officers and directors for the benefit of its shareholders, the Special Committee's conclusion that plaintiff proposed would more likely

hurt shareholders is amply supported by this record.

Defendants' statutory Motion to Dismiss will be allowed and this action will be dismissed in its entirety with prejudice. A judgment consistent with this Memorandum of Decision is entered simultaneously herewith.